Good morning. It's our privilege to be hearing cases in Honolulu this week. It's great to be back in Hawaii, and we look forward to the arguments of all counsel both today and the rest of the week. It's my special privilege to be sitting with Judge Sid Thomas and Judge Ana de Alba, and it's my first opportunity to hear cases with Judge de Alba, who's a new member of our court, and I want to extend our warmest welcome to you. We have four matters on the calendar. Two were submitted on the briefs, United States v. Roberto and Evan Aldsusot v. Lauren Galindo. Those matters were submitted. We'll turn to the first argument case on the argument calendar. It's Case 24-823, S&G Labs Hawaii v. Graves. Good morning. May it please the Court? There is a legislative intent, obviously, behind every statute, but it cannot have been Congress's intent when it passed ECRA, the Eliminating Kickbacks and Recovering Act, that a party should face the choice between criminal prosecution for violation of its terms or being exposed to a $7.5 million judgment for refusing to enforce an executory contract that had been rendered unlawful by the statute. And yet, that is exactly what happened here. The District Court, taking it upon itself to rule on an issue that had not been briefed by either party, concluded that ECRA did not apply to the statute between, I'm sorry, did not apply to the contract between Mr. Graves, the plaintiff, and our clients. Even though that statute, even though that contract explicitly and quite rationally until the law was passed, rewarded him for the number of tests and the revenue generated by tests by the laboratory. Why, Mr. Coleman, why do you think ECRA should be read to prohibit what appears to be a standard marketing arrangement with somebody? Because this is not a standard market, Your Honor. It is, in fact, the case that sales arrangements, sales and marketing people are and ought to be rewarded for productivity, for bringing in customers. This, however, is not a regular market. Consumers who take the tests, patients, have very little to say and very attenuated preferences with respect to where their tests are taken. They go where their doctor tells them or where their insurance company tells them. In this case, Congress recognized that there was a problem, and that problem was the abuse of the relationship between laboratories and care providers. And Congress stepped in and said, although under normal circumstances someone who brings in business is rewarded with commissions or with compensation that is appropriate for the amount of business you bring in, it's not going to be able to be done here. You can't do it that way anymore because this is not a normal market. This is not a market where supply and demand operate. It's a heavily regulated market. Consumers don't have particularly strong preferences. The real consumers here are the care providers, and therefore we're going to cut off that direct revenue connection, and there's going to have to be another way for you to reward your producers. The statute, though, uses the phrase, induce a referral of an individual. So why do you think that sort of undifferentiated generic marketing to a doctor's office, for example, would fall within that? Well, only an individual can have a lab test. The way placed by the district court on the word individual actually, as we explain in our brief, renders the previous part of the statute surplusage. There's no reason for it to exist. Let's assume you're right about this. I mean, that to induce a referral of an individual, that can cover somebody like Graves, who's not a doctor, who's actually making referrals. But even so, why would it cover somebody who's just engaged in standard marketing and not actually moving a patient from one service to another, for example? Your Honor, because it's not a standard market. This is a statute that was meant to solve a problem. I think the court recognizes very well, and Congress recognizes very well, that the market and the economy related to the provision of medical services and all the services that attend the provision of medical care is a highly regulated, highly inefficient, and highly manipulatable market. That's a fair point, but I guess I'm just looking at the language chosen, and induce is a somewhat strong term, right? And I'm not sure that we would normally think that just generic marketing, if somebody puts an advertisement on television, would you say they've induced my purchase of the good? I'm not sure that's right. Well, the statute does say reduce directly or indirectly. That's pretty important. And what you have here is, the record is very clear that what Mr. Graves did, which was what his job was, was to develop relationships with caregivers and with institutions that control many caregivers, and induce them to use the laboratories that he worked with to send them their business. But, I mean, is there any suggestion that what he was doing was not, you know, the Fifth Circuit, for example, in the anti-kickback statute context, talks about unduly influencing or exercising sort of control over the referral itself. Is there any allegation that that's what your client was hiring Graves to do? No, not at all. Of course, the anti-kickback statute is a different law. It is one in which, with respect to which the Attorney General has, over the very long period that it's been in place, has issued numerous regulations to deal with the economic realities of that situation. But again, here Congress made a different decision, saying that just as many forms of economic activity are regulated, and for important public policy reasons, normal economic incentives have to be changed. And the facts here demonstrate that our clients reacted to that change by saying to the plaintiff, According to our legal advice that we've gotten from counsel, which is a point that the court did not permit, the district court did not permit to be placed before the jury, our lawyer, who is an expert on health care, tells us that this new law prevents us from paying you the way we always paid you. So here's what we want to do. We're going to give you a raise from a $50,000 salary plus commissions to a $1 million salary to do the same thing. We just can't tie your compensation to revenue the way we used to. That's a pretty good economic outcome for everyone concerned. Counsel, I'm sorry to interrupt. I want to know a little bit more about why you think this does not fall under the safe harbor provisions, the ECRA safe harbor provisions. That, and I quote, a payment made by an employer to an employee or independent contractor for employment is permitted so long as the employee's payment is not determined by or does not vary by A, the number of individuals referred to a laboratory, the number of tests or procedures performed, or the amount billed or received from a patient's insurance company. Well, for one thing, to read the safe harbor, that broadly would be to eviscerate the entire statute. Because precisely what was happening here is what the statute was passed to prevent. The district court did not rule that the safe harbor was the basis. Rather, the district court ruled that the statute simply didn't apply under exceptions based on the anti-kickback act. You focused a lot of your argument, all of it, actually on this issue of ECRA. But if you win on that, hypothetically, does that take away all of this verdict or only some of it? What about the defamation, for example? Your Honor, of all the issues in this case, the defamation seems to be the least of our clients' concerns. Not because it's an insignificant amount of money. In fact, we would argue that there was no evidence presented to justify defamation damages whatsoever. We argue in our brief that the defamation claim is simply not supported by Hawaii law. Far more important to us was the award of front and back wages, both in the absence of adequate evidence to justify those awards. The front wages award of $3.5 million was obviously based on the offer by our clients of $1 million a year annual salary, prorated for the 3.5 years, that contract law provides the benefit of the bargain damages for a breach. It does not provide the benefit of the non-bargain. There was no bargain. That offer of a million-dollar salary was not accepted. I mean, we're talking about a measure of damages. So why wasn't it a reasonable measure of damages based on your client's own assessment of what he was likely to make if they restructured the contract? Because that was not the contract. The jury found a breach of the – the judge ruled that the original contract was not illegal and therefore that Mr. Graves should be paid pursuant to the original contract. You can't have the benefit of a contract breach for an executory contract and the damages for a non-accepted alternative contract, especially when my clients were prevented from submitting any evidence about – first of all, there was no expert testimony with respect to damages, and my client was unable to testify about how their business had suffered to the extent that any inference that could be made from the offer of a million-dollar salary could have been rebutted. I see I'm down to my last couple of minutes, so I'd like to save that. Thank you. May it please the Court, Your Honors. My name is Leighton Hara, and I represent Darren Graves, the appellee in this matter. Mr. Graves requests that this Court affirm the district court's ruling and affirm the jury's verdict in this case. The central issue in this case is whether ECRA applies to prohibit Darren Graves' commission-based compensation agreement, and we submit that it does not, and Judge Kobayashi ruled correctly on this issue for three reasons, the first one being the plain language of the statute. Section 228.2, the provision that applies in this case, prohibits S&G from paying kickbacks to induce a referral of an individual to a laboratory. In this case, it's undisputed that ECRA does not specifically, the plain language does not specifically proscribe commission-based compensation agreements. That's not in the plain language of the statute. It needs to be interpreted. However, the term individual is in there, and the Court correctly utilized the dictionary definition of individual to define it as a natural person and then rationed that Mr. Graves did not market or solicit or do any marketing activities to the end user, the individual patient. So how do you deal with the directly or indirectly language in the statute? So the indirect and direct. I mean, the argument is, their argument is, it doesn't matter if indirectly, if somebody indirectly solicits, that's still a violation of the statute. Well, indirectly solicit would apply to the S&G company. They're indirectly using Darren Graves, right, the sales representative, and then Darren Graves is talking to the clinic, not the individual end user. So it's attenuated in that sense. Your argument is that the language does not apply to your client? What I'm arguing, Your Honor, is that— What do you think indirectly means in the statute? Not direct, attenuated, further out from Mr. Graves doing something to induce the referral of an individual. Isn't the individual the person who needs care? You're inducing a referral of an individual, so that is the person being referred. Correct, Your Honor. Okay, well, so then why—so a doctor could induce a referral. Why couldn't Mr. Graves induce a referral by forcing a doctor to refer somebody, for example? Forcing—yes, in certain cases that interpreted the AKS under the Fifth Circuit and GIF Industries, they did interpret ECRA and the companion statute, AKS, to include some level of inducing or bad conda in addition to referring the individual. In that situation, the sales representative had to improperly influence the health care decision maker, which I think Your Honor is alluding to. Correct, right. I mean, it seems to me, at least the way I read the district court's decision, was that somebody like your client could just never be within ECRA at all. And I'm questioning whether that's correct and whether it is more like what you just mentioned, whether it should be somebody who improperly influences or something like that. Your Honor, just based on the scarcity of case law, so reviewing the Fifth Circuit cases, the GIF Industries, the District of Pennsylvania case, and Judge Kobayashi's ruling, in addition to the Sheena case, courts have included an improper undue influence element into whether or not a contract has been violated, violates ECRA. Judge Kobayashi's ruling does not include that and stands on the plain language of an individual. I disagree. I think that Graves could still be found, S&G or Graves could be found in violation of ECRA under its plain meaning if Graves directly marketed an individual. He would have not fallen under the safe harbor provision if he walked in front of a clinic that didn't use S&G lab services and talked to every patient that came in and said, hey, why don't you come to S&G labs, we offer better services. That would be a violation of Section A2. And because he's being paid a commission-based compensation, it would not fall under the safe harbor provision. So because in your scenario there, Counsel, he's talking to the individuals and not the doctor, that's where he could be in violation of ECRA. But if he goes to that clinic, same clinic, same scenario you're showing me, and instead of people who are walking out says, hey, come to S&G, he goes inside and says to the doctor, hey, you should send all these folks to S&G. Would that be in violation? No, it wouldn't because he's talking to the doctor, and he hasn't done anything to exert undue influence. That's the typical marketing scenario. That would be the equivalent of buying a newspaper ad or a targeted solicitation in, like, a medical journal saying, hey, S&G labs is the great lab, come to us. So there's no element of undue influence in there, and more importantly, he's not marketing to an individual. So under Judge Kobayashi's order, he would not be in violation. So what would count as undue influence? Undue influence, according to the Fifth Circuit cases and the Eastern District, undue influence would be going out of your way to influence the health care decision maker. In the cases that were cited, like Miles and Shoemaker, I believe that the salesperson, when they did find undue influence, the salesperson basically stood in the shoes of the decision maker. So the salesperson could direct where everything went and didn't give, like, they stood in the place of the doctor, basically. And in this case, there's evidence. Dr. Puana testified in her affidavit that she submitted in support of her motion for summary judgment that the clinics don't have any contractual relationship with S&G labs, that they could terminate their agreement any time, and it's been done via a single-page email. So there is evidence that Darren Graves has not exerted any undue influence. There's no evidence in the record that he has. Counsel admitted that, during his argument, that there's no allegation that Graves has paid remunerations or done anything to unduly influence health care decision makers or patients. Can I ask you about some of the other components of the jury verdict? There was a—well, let me start with the defamation. So what was the defamation? Okay. So, Your Honor, to answer that question, you've got to take a couple of steps back. Graves was employed. He had an employment contract. He was placed on suspension, leave with pay, in June of 2019. He was placed on leave with pay. Okay? So then what happened was he was prohibited from contacting any of his clients, the clinics and the drug treatment centers. And during that time, when he was prohibited from contacting them but still employed, Dr. Welch, or Dr. Puana, she goes by both names, and her associate, Stephanie Castro, visited all of Darren Graves' clients and told them, at least two of them, Tony Acurio, who testified and we cited to his testimony in the brief, and Taylor Yap, another clinic worker, their clients of S&G Labs, both of them testified that Dr. Puana told them that Darren is no longer with the company. And that was true, wasn't it? No. Because he was suspended. Yes, Your Honor. He was suspended. So I'm answering your question that, yes, he was suspended, but it's incorrect in the sense that he was not terminated, he was not separated from employment. And the other point that I was going to make is that, in addition to telling them an untrue statement that Darren is no longer with the company, they rubbed salt in the wound by telling Taylor Yap that she had to file a federal lawsuit against him for stealing trade secrets and information. So that is what the defamatory statement is. It's an untrue statement. And she was – there's a credibility determination, right? Dr. Puana testified that she did not say that. Darren Graves did and so did Taylor Yap and so did Tony Acurio. The jury weighed credibility and made a determination, which is shown by the punitive damages awards for defamation. Counsel, I just want to confirm that through the facts, as I recall them, the term terminated or separated from the company was never used. It was just he's no longer employed here. Is that correct? Okay. So let me break that down. So yes to your first question, Your Honor. The term terminated and fired, they were not used. I've never, ever argued that in my brief, and that's undisputed. With respect to the second part of your question, though, the statement was he's no longer with the company. That's what was told to the two people. So no longer with the company, and they took that to mean he was fired. So there is a distinction between he's suspended while we sort things out or he's no longer with the company. I had to file a federal lawsuit against him for stealing trade secrets. Would it have made things any better if she had said he was suspended? What's the difference between saying he's no longer with the company and he's suspended just as a practical matter in terms of what one would take away from that? It would be speculation on my part, Your Honor. And there's no evidence to that in the record. But to answer your hypothetical, yes, I think telling the clientele that he's suspended is different because it would have been truthful, and it wouldn't be a situation where he's completely out of the market. There's a chance that he can come back. I apologize, counsel, for cutting you off there. I'm going to continue with the line of questioning from my colleague, Judge Bress. For all intents and purposes, suspended versus terminated, for a purpose of a customer or a client, what's the difference? I mean, if he's suspended, he cannot continue to do work for them. He cannot continue to market for them or do whatever it is that he was doing for them. So for them, isn't there really not a difference between him being suspended or no longer with the company? I wouldn't be able to speak to that in the sense that they weren't told that he was suspended, but the testimony that they gave in court was that, based on the fact that the statement, he's no longer with the company, they took that to me, and the other things they said, they took that because there was no way that Darren was ever going to service their accounts again. So what that did was it had a chilling effect on all his sales. Like after Darren left, even though he wasn't subject to a non-compete clause, he couldn't get any of his former clients back. So we're talking about the false statement being no longer with the company, when in fact he was with the company, he was just suspended. If we didn't have this, if she had just said he's been suspended, was there a defamation claim based on some other evidence or does it really hang on this distinction between whether he's still with the company or not? Your Honor, it hangs on the distinction that he was no longer with the company. That's the false statement, and coupled with all the other evidence they came in. Well, that's what I'm wondering about the other evidence because how much of that goes into the claim? The other evidence being we filed a lawsuit against him, which they had, so that was seemingly true. He disputed the basis for the lawsuit, but they had done that. Right, and then the court later on found that those claims of stealing trade secrets were not valid and found in his favor. So at the time – No, that's true, but was it – were these comments about the lawsuit to the clients defamatory or are you not arguing that? No, I'm not arguing that the statements about the – because she did file a federal lawsuit. But what I'm saying is when taken as a whole, when you have your boss coming to your clients and telling them a lie, he's no longer with the company, I had to file a federal lawsuit against him for stealing trade secrets, it connotes this cloud of wrongdoing that envelopes my client, and it succeeded in keeping his clients from ever coming back to him. Counsel, is it your – oh, I'm sorry. Go ahead. Okay, is it your position then had Dr. Puana said I had to suspend him and now I'm suing him for trade secrets, that makes it materially different in terms of what would happen to his – you talked about chilling effects. Would you not agree that that would also have a chilling effect? I think it would have a negative effect on his relationship with his clients, Your Honor, but it would be a true statement that he was suspended. I don't agree with the suspension, and I think the reasons, therefore, are contextual as it played out at trial, but I agree with you that if she said suspended, that would have been truthful. And there are emails that came into evidence that say, you know, I had – she's – Dr. Puana emails clients and tells them that she had to suspend Aaron, but it's different from what she told these clinic, you know, workers and who I had testify at trial. So that's the distinction. No longer with the company, they took that to mean terminated. Was there any testimony that indicated that suspension had more of a defamatory or less defamatory meaning than no longer with the company? No, Your Honor, because – I think that's the question. We're trying to differentiate what the damages might flow from saying he's no longer with the company plus and we're suing him versus he's suspended and we're suing him. To me, it doesn't seem to me there's that much quantitative difference in terms of damage. But you say there is. My only question is, is there anything in the record on that? I think your answer is no. My answer is no, Your Honor, because, you know, I – that wasn't my burden to prove regarding the suspension versus – It was your burden to show it was false and had defamatory meaning. Yes, correct. And I believe I did that and the jury agreed because the statement, no longer with the company, he was still employed. Dr. Puana testified that at the time she suspended him, if her investigation proved – fell in Darren's favor, she would have reinstated him wholeheartedly. And coupled together, just taking the facts as a whole, that supports the jury's decision that a false statement was made and Darren was harmed because of it. And you had to show proximate cause. Go ahead, sir. No, no, go ahead. Well, I mean maybe building on that, what is the basis for saying that this conduct that we're talking about was wanton or rises to the level of punitive damages? Because we're talking about a somewhat fine distinction between whether you're still with the company or whether you're suspended. Maybe it was technically untrue, but she had filed a lawsuit. She had accusations, allegations. They didn't pan out in court, but what is the basis for saying this was wanton? The history of her employment relationship with Darren, the jury got to hear everything, right? They got to hear how he helped build the company. He brought in these clients to S&G Labs. He took it from a $800,000-a-year company to a multimillion-dollar company. And then when their relationship soured in 2018, when in the middle of his employment contract, Dr. Puana used ECRA as a negotiating tool to insert a non-compete clause. The jury got to see that. They got to see how she unilaterally changed his compensation. She ratcheted it down from his commissions were about $1.8 million a year. She ratcheted it down based on her calculations to about $1 million, and she paid him that while he was on suspension. And then after that, she ratcheted it down to $50,000. So the jury gets to see this. She files a trade secret lawsuit against him, preliminary injunction. She loses it. The court rules against her. And then she goes to his clients while he's on suspension, makes false statements, tells them that he's no longer with the company, gives his clients the thought that he's fired and no longer there when he, in fact, is. So the jury had all that. So that shows willful and wanton, Your Honor. It's got to be taken as a whole, and that's what the members of the jury got to see through the presentation of evidence at trial. We'll let you go a little over, but let me see if my colleagues have additional questions. Thank you very much for your presentation this morning. Oh, you're welcome, Your Honor. Pleasure to see all of you. Thank you for the opportunity to address a couple of points. The court was very interested in the question of defamation, and Your Honor has asked some hypothetical questions I'm going to answer, if I may, hypothetically, that if someone were to call my office where I formerly worked and was told Mr. Coleman is no longer with the firm, that would be consistent with my being fired. It would also be consistent with my being elevated to the Ninth Circuit Court of Appeals. There are lots of things that no longer with the firm can mean. Suspended, however, does not include any good things. And, in fact, we would submit that suspended is a better, is a worse thing, even if it's true, it's a worse thing than no longer with the company. Was this argument made to the jury? I don't know that it was, but I also, since Your Honors are asking the question about how do we take this concept of suspended to be defamatory, I don't believe it holds that weight. Well, let's assume you're right on this point, but what does it do for you? What it does for me is demonstrate that there was no defamation. There was no defamatory statement. Except when you couple it with Ann were suing him. That doesn't necessarily connote a promotion. But that was true. Well, yes, of course. But, I mean, you're arguing as you could have been elevated to a higher position with being no longer with the company. But in the whole context, it's hard to see, hard to attribute that meaning to it. It is possible, Your Honor. There was a question about undue influence. There's no language in the statute requiring a showing of undue influence or any conduct involving fraud or undue influence or force. Your Honors asked me at the very beginning, actually Judge D'Alba asked me about the safe harbor. The accurate safe harbor does apply to employment-related payments only if payments to an employee, quote, were not determined by or did not vary by the number of tests or procedures performed or the amount billed to or received from a health benefit care program. So that is an exception to the exception. So the safe harbor definitely does not apply. That's why the court didn't hold that it did. And finally, there was a very, I think, illuminating colloquy where counsel said, it's not as if you stood in front of the clinic and told people to go. It's hard to imagine Congress passing this statute in order to prevent people from handing out handbills and talking individual patients into going from one lab to another, especially, again, as I pointed out at the beginning, patients don't usually care. They just want to know that they're covered and that their doctor is satisfied with the laboratory testing. Well, let me just ask you before you sit down. I mean, if S&G had hired Graves to just prepare brochures, come up with a glossy brochure and walk around Oahu and drop it off at all the clients and later structure the payments so that Graves would get percentages if any of the doctor's offices sent patients, are you saying that the sending of the brochure would be inducing a referral? I think that would be quite a leap, Your Honor, and we would not be arguing that. What the facts in this case, however, show is that Mr. Graves had very specific and very lucrative relationships with the care providers who made the referrals, and that is what ECRA was meant to address. Okay. Well, thank you very much, Mr. Coleman. Thank you, Mr. Hara. This matter is submitted.
judges: THOMAS, BRESS, ALBA